**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| David Robert Ruderman, | ) | CIV 09-887-PHX-GMS (MHB) |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Charles L. Ryan, et al., | ) | |
| Respondents. | ) | |

TO THE HONORABLE G. MURRAY SNOW, UNITED STATES DISTRICT JUDGE:

Petitioner David Robert Ruderman, who is confined in the Arizona State Prison Complex-Eyman, Rynning Unit, in Florence, Arizona, has filed a *pro se* Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 and a "Brief in Support of Petition" (Docs. ##1, 3). Respondents filed an Amended Answer on November 12, 2009 (Doc. #18), and Petitioner filed a Reply to Respondents' Amended Answer on December 9, 2009 (Doc. #19).

**BACKGROUND**

In May or June 2003, Kim and her boyfriend, Aaron, moved from Nebraska to Chandler, Arizona. (Doc. #18, Exh. A at 9-11, 53; Exh. C at 11.) Initially, Kim's two children – "K" and "M" – stayed in Nebraska with Kim's ex-husband, Jason. (Doc. #18, Exh. A at 10-11, 53.) However, in September 2004, Jason was deployed overseas and K and M moved to Arizona to live with Kim. (Doc. #18, Exh. A at 11, 53-54.) Kim normally worked Thursday through Monday from about 4:00 p.m. to 1:00 a.m., and Aaron worked from 8:00 a.m. until 5:00 p.m. or 6:00 p.m., five to seven days a week. (Doc. #18, Exh. A at 12, 55-56.) Considering commuting time to and from work, there was a two to three hour gap during which neither Kim nor Aaron was available to care for K and M. (Doc. #18, Exh.

A at 12-13, 56.) Initially, a co-worker of Kim's, who worked the day shift, was able to baby-sit during this time frame, but, after only one week, she got another job and was no longer available to baby-sit. (Doc. #18, Exh. A at 13, 58.)

Kim had "one day to find a baby-sitter" and a friend suggested that she go "on line" to try to find one. (Doc. #18, Exh. A at 58.) Kim checked several different baby-sitter web sites, including "baby-sitter.com." (Doc. #18, Exh. A at 58.) Kim called four women she found on baby-sitter.com, but all four wanted $200 to watch the children over the weekend, more than Kim could afford to pay. (Doc. #18, Exh. A at 58-59.) Petitioner "was the last one [Kim] tried on the list because he was a male." (Doc. #18, Exh. A at 58.) However, Kim was impressed with Petitioner; he was "very polite," and Kim "led the whole conversation." (Doc. #18, Exh. A at 58-59.) Kim explained her situation and asked Petitioner "how much he wanted" to baby-sit "two young kids." (Doc. #18, Exh. A at 59, 64.) Petitioner said "whatever was acceptable for [Kim]," explaining that he "was doing it just to help out parents." (Doc. #18, Exh. A at 64.) Kim said she could afford to pay Petitioner $120 a week, and Petitioner agreed to that amount. (Doc. #18, Exh. A at 64.)

Petitioner began baby-sitting then 6-year-old K and 3-year-old M around mid-September 2004. (Doc. #18, Exh. A at 54, 58.) Kim thought Petitioner was a "great" baby-sitter and "thought the world of him." (Doc. #18, Exh. A at 65.) Petitioner "always brought a lot of toys over" and was "very attentive" to the children. (Doc. #18, Exh. A at 16, 65-66.) K and M "loved him." (Doc. #18, Exh. A at 65.) In fact, Kim's neighbors "were envious of [her] over the type of baby-sitter [she] had." (Doc. #18, Exh. A at 66.) Kim "cared about" Petitioner, and told him so. (Doc. #18, Exh. A at 66.) Aaron also thought that Petitioner was a "[v]ery nice guy." (Doc. #18, Exh. A at 15.) They were "very friendly," and Petitioner often stayed for an additional 10 to 15 minutes after Aaron got home, playing with the children and talking with Aaron. (Doc. #18, Exh. A at 15-16, 46.) On one occasion Petitioner, who "worked at nighttime at a computer place," helped Aaron "with a computer problem." (Doc. #18, Exh. A at 15.) As far as Aaron was concerned, Petitioner was "a great guy, great baby-sitter." (Doc. #18, Exh. A at 40.)

In late January 2004, Aaron started a new job and had to work until 8:00 p.m. (Doc. #18, Exh. A at 17, 65.) Petitioner baby-sat for longer hours and requested no additional compensation. (Doc. #18, Exh. A at 65.) On a couple of occasions, Petitioner baby-sat for additional days, again without requesting additional payment. (Doc. #18, Exh. A at 65.)

On Friday, February 11, 2005, Aaron called Kim and asked her to ask Petitioner if Petitioner could watch the children until about 11:30 p.m., so that Aaron could go out after work with some friends. (Doc. #18, Exh. A at 16-17, 66.) Aaron cut his outing short, arriving home at about 9:30 p.m. (Doc. #18, Exh. A at 18.) As he entered the apartment, Aaron was talking to his brother on his cell phone, continued the conversation for approximately 45 seconds, then headed towards the children's closed bathroom door. (Doc. #18, Exh. A at 18.) Aaron "heard the kids playing in the bathtub," and opened the door. (Doc. #18, Exh. A at 18-19.) In the mirror, Aaron saw Petitioner "standing up against the wall pulling up his pants." (Doc. #18, Exh. A at 18-19, 30-31.) Petitioner had on "navy blue underwear," and was pulling up a pair of blue denim pants, which were "dry with patches of wet" on the pants. (Doc. #18, Exh. A at 19, 22.) Aaron was "in shock," and, "didn't know what to think." (Doc. #18, Exh. A at 20.) He said nothing, and then turned and walked to the living room and sat on the couch to "collect [his] thoughts." (Doc. #18, Exh. A at 20.)

About a minute later, Petitioner came out of the bathroom, "put all the toys in his bag," then walked out of the apartment "with his head down," without saying anything to Aaron. (Doc. #18, Exh. A at 20-21.) This "wasn't the way he acted towards [Aaron]." (Doc. #18, Exh. A at 21.)

Aaron did not call the police because he "didn't know what to think of the whole situation." (Doc. #18, Exh. A at 37-38.) He called Kim at work, told her what he had seen, and suggested that she "talk to her kids when she came home." (Doc. #18, Exh. A at 20, 37-38, 47, 66.) Kim "was wondering what was going on," but "wasn't worried about it," because she thought Petitioner "was the greatest baby-sitter ever." (Doc. #18, Exh. A at 67.) She knew that Petitioner had given the children baths on two prior occasions and "really

didn't think anything of it." (Doc. #18, Exh. A at 67, 80.) Aaron told Kim to call Petitioner. (Doc. #18, Exh. A at 67.)

Kim telephoned Petitioner and told him that Aaron had called her and "made it sound like [she] should be concerned about [Petitioner] in the bathroom with the kids." (Doc. #18, Exh. A at 67.) She asked Petitioner if he had given the children a bath; Petitioner answered "yes." (Doc. #18, Exh. A at 67.) Kim then asked Petitioner "if he got in the bath tub with the kids." (Doc. #18, Exh. A at 67-68.) Petitioner said that he had, explaining that "the kids always ask him to get in the bathtub with them whenever he does give them their bath," asking Kim "if that was going to be a problem." (Doc. #18, Exh. A at 68.) Kim said "it probably wasn't a good idea" for him to do it any more. (Doc. #18, Exh. A at 68.) Petitioner replied, "okay," and they ended their conversation, leaving Kim with the belief that Petitioner "was just in there playing with them." (Doc. #18, Exh. A at 68.)

The following afternoon, while Kim was in her bedroom getting ready to go to work, she called K over and "asked her if there was anything [Kim] needed to know about [Petitioner], if there was ever any touching or any kind of physical contact, if he had ever touched her down there." (Doc. #18, Exh. A at 70.) K "laughed" and said "no." (Doc. #18, Exh. A at 70.) Kim was relieved but, less than five seconds later, K looked up at Kim with an "embarrassed" smile on her face and said, "but [M] sucked his ... wiener." (Doc. #18, Exh. A at 71, 83.) Kim "freaked out" and asked K "if she was sure." (Doc. #18, Exh. A at 71, 83.) Kim "couldn't breath[e]," and "didn't know what to do." (Doc. #18, Exh. A at 72.) She "didn't know whether or not to believe it was true." (Doc. #18, Exh. A at 72.)

Kim immediately called Petitioner and told him she "didn't need him because [she] didn't have to go into work that day." (Doc. #18, Exh. A at 74.) Petitioner said "okay," and asked if she needed him to work the following day, Sunday. (Doc. #18, Exh. A at 74.) Kim said she "didn't know yet and that [she would] call him to let him know." (Doc. #18, Exh. A at 74.) After speaking to Petitioner, Kim called her mother, ex-husband, and Aaron. (Doc. #18, Exh. A at 73.) Aaron drove Kim, and the children, to the Chandler Police Department. (Doc. #18, Exh. A at 73.)

At about 9:00 p.m. that evening, after speaking to Kim and Aaron, Detective Gary Minor conducted a videotaped interview of K. (Doc. #18, Exh. B at 38; Exh. C at 12.) K said she was in the bathtub with Petitioner and M, and that M had pulled up a leg hole on Petitioner's shorts and Petitioner's "penis came out of his shorts." (Doc. #18, Exh. C at 12-13.) K said that Petitioner's "wiener" was "big, long and stuck straight up." (Doc. #18, Exh. C at 13.) K said that M then "started to suck on [Petitioner's] privates." (Doc. #18, Exh. D at 84.)  K said that it happened two times, the previous Saturday (February 6) and, previously, on a Sunday.  (Doc. #18, Exh. C at 13-14.)

Detective Minor arranged for both K and M to be interviewed by forensic interviewer Cherie Leffler, who specialized in interviewing children under the age of eight. (Doc. #18, Exh. A at 92, 104; Exh. B at 39-40.) Ms. Leffler first interviewed K. (Doc. #18, Exh. A at 105; Exh. B at 11.) K said that she and M took a bath with Petitioner. (Doc. #18, Exh. A at 107.) K and M were naked; Petitioner wore blue "swimming trunks or underwear." (Doc. #18, Exh. A at 107-08.) Petitioner sat "closest to the water spout," K was "in the center," and M "at the end of the tub." (Doc. #18, Exh. A at 108.) Petitioner "reach[ed] over" K and picked up and lifted M over K. (Doc. #18, Exh. A at 108.) K said that Petitioner's "wiener was out of his pants." (Doc. #18, Exh. A at 109.) When asked how his wiener got out, K "lifted up the leg of her shorts and indicated that his wiener came out the leg of his pants." (Doc. #18, Exh. A at 109.) K said that "[M] touched his winer [sic]," making "a circle with her index finger and her thumb in an up and down motion." (Doc. #18, Exh. A at 109.) K said that "after [M] touched [Petitioner's] wiener that it was sticking straight up." (Doc. #18, Exh. A at 109.) "Then M put his mouth on [Petitioner's] wiener." (Doc. #18, Exh. A at 109.) K said "this happened on two separate occasions." (Doc. #18, Exh. A at 109.) Initially, K said it happened on "Sunday and Monday," but later said "Saturday and Sunday." (Doc. #18, Exh. A at 110-11.)

Ms. Leffler then attempted to interview 3-year-old M, but he was "unwilling or unable in the end to give [her] any information." (Doc. #18, Exh. B at 11-12, 16, 30.)

Before speaking to Petitioner, Detective Minor checked the Internet and found "about roughly five sites that [Petitioner] had listed on for his baby-sitter services." (Doc. #18, Exh. B at 45.) On February 13, 2005, Detective Minor spoke to Petitioner at the Chandler Police Department, after advising him of his Miranda rights. (Doc. #18, Exh. B at 44-46.) Detective Minor told Petitioner "there had been an accusation made against him of molesting a child." (Doc. #18, Exh. B at 47.) Petitioner, "laughed," and said, "that's ridiculous." (Doc. #18, Exh. B at 47.) Detective Minor then discussed "the accusations of being in the bathtub with the children." (Doc. #18, Exh. B at 47.) Petitioner admitted that he "was in the bathtub with the kids," "equat[ing] it to swimming," but "denied anything sexual happening with the children." (Doc. #18, Exh. B at 47.) Petitioner said he "was wearing a green pair of shorts." (Doc. #18, Exh. B at 47.) Petitioner said he "had been in the tub twice with the children, two separate occasions." (Doc. #18, Exh. B at 48.) Petitioner "denied his penis coming out of his shorts," or having "any sexual contact with the children." (Doc. #18, Exh. B at 49.)

Detective Minor asked Petitioner if the children could have seen his penis "by accident": Petitioner answered "no." (Doc. #18, Exh. B at 49.) Detective Minor asked Petitioner "if his penis was out and he had an erection," Petitioner said he "did not." (Doc. #18, Exh. B at 49.) Detective Minor asked Petitioner if the children might haven seen him "urinating." (Doc. #18, Exh. B at 49.) Initially, Petitioner said, "I don't know," or, "I don't think so," then later said they "did not see him urinating at any time." (Doc. #18, Exh. B at 49.)

Regarding the incident where Aaron got home early, Petitioner said he "heard Aaron come in, he got out of the tub," then "wrang out his shorts while still wearing them and then pulled his pants up over his wet shorts." (Doc. #18, Exh. B at 54.) Petitioner said that he was in the tub with the children on the night Aaron came home early (Friday, February 11), and "within two weeks prior to that." (Doc. #18, Exh. C at 15.)

On February 22, 2005, the State of Arizona filed an indictment in Maricopa County Superior Court charging Appellant with two counts of sexual conduct with a minor, class 2

felonies and dangerous crimes against children (Counts 1 and 3), and two counts of public sexual indecency to a minor, class 5 felonies (Counts 2 and 4.) (Doc. #18, Exh. N.)

At the close of the State's case, Petitioner moved for directed verdict on all counts. (Doc. #18, Exh. C at 16.) The trial court granted Petitioner's motion for judgment of acquittal on Counts 1 and 2. (Doc. #18, Exh. C at 26-27). The jurors convicted Petitioner on Counts 3 and 4. (Doc. #18, Exh. E at 3.) The trial court imposed presumptive, consecutive sentences of life imprisonment on Count 3, and 1 ½ years' imprisonment on Count 4. (Doc. #18, Exh. M at 11-12.)

Petitioner filed a direct appeal, raising a single claim: that the trial court committed fundamental error when it sentenced him to life imprisonment. (Doc. #18, Exh. F.) The Arizona Court of Appeals affirmed Petitioner's conviction and sentence. (Doc. #18, Exh. F.) Petitioner did not file a petition for review in the Arizona Supreme Court.

On December 14, 2006, Petitioner filed a Notice of Post-Conviction Relief. (Doc. #18, Exh. G.) Petitioner subsequently filed a Petition for Post-Conviction Relief, and raised six claims: (1) the State presented insufficient evidence of his guilt; (2) the prosecutor committed misconduct during closing argument by vouching for witnesses and mischaracterizing trial testimony; (3) juror bias; (4) the prosecutor tainted jury selection by discriminatory use of peremptory challenges; (5) Petitioner was improperly denied a preliminary hearing; and (6) trial counsel rendered ineffective assistance. (Doc. #18, Exh. H.)

On August 30, 2007, the trial court found that the Petition for Post-Conviction Relief "fail[ed] to present a material issue of fact or law which would entitle [Petitioner] to relief" and thus dismissed Appellant's claim. (Doc. #18, Exh. I.)

Petitioner subsequently filed a "Notice of Appeal" in the Arizona Court of Appeals which provided, in totality, as follows:

> Notice is hereby given that Petitioner David Ruderman, in propria persona, in the above case, appeals to the Court of Appeals of the State of Arizona from the final judgment entered in this action on the 31st day of October, 2007.

(Doc. #18, Exh. J.)  Petitioner also filed a Petition for Review arguing:  (1) his convictions were based upon insufficient evidence; (2) the state committed misconduct through improper vouching and by misrepresentations of the evidence during closing argument; (3) juror bias; (4) the prosecutor tainted the jury by discriminatory use of peremptory challenges; (5) he was denied his right to a preliminary hearing; and (6) ineffective assistance of counsel.  (Doc. #18, Exh. O.)

The Arizona Court of Appeals denied review, and, on February 5, 2009, the Arizona Supreme Court denied review. (Doc. #18, Exhs. J, K, L.)

On April 27, 2009, Petitioner filed the instant Petition for Writ of Habeas Corpus (Doc. #1) and "Brief in Support of Petition" (Doc. #3).  Petitioner raises six grounds for relief.  In Ground One, he alleges that he was denied his Fifth and Fourteenth Amendment rights to due process because the evidence was insufficient to prove guilt beyond a reasonable doubt.  (Docs. #1 at 6; #3 at 3.)  In Ground Two, he alleges that he was denied an impartial jury in violation of his Fifth, Sixth, and Fourteenth Amendment rights.  (Docs. #1 at 7; #3 at 5.)  In Ground Three, he alleges that the prosecutor vouched for witnesses and misstated or mischaracterized testimony in violation of Plaintiff's Fifth and Fourteenth Amendment right to due process and a fair trial.  (Docs. #1 at 8; #3 at 7.)  In Ground Four, Petitioner alleges that prospective jurors were impermissibly stricken by the prosecutor based on gender in violation of equal protection under the Fourteenth Amendment.  (Docs. #1 at 9; #3 at 10.)  In Ground Five, Petitioner alleges his Fifth and Fourteenth Amendment right to due process was violated when he was denied a state-created right applicable to criminal defendants.  (Docs. #1 at 12; #3 at 11.)  In Ground Six, he alleges that he received the ineffective assistance of counsel at trial in violation of his Sixth Amendment rights based on the failure to make appropriate motions and objections and to preserve constitutional issues.  (Docs. #1 at 13; #3 at 12.)

Respondents filed an Amended Answer on November 12, 2009 (Doc. #18), and Petitioner filed a Reply to Respondents' Amended Answer on December 9, 2009 (Doc. #19).

**DISCUSSION**

In their Answer, Respondents contend that Ground Five fails to state a basis for federal habeas relief, and the remaining claims fail on the merits. As such, Respondents request that the Court deny and dismiss Petitioner's Petition for Writ of Habeas Corpus with prejudice.

**A.    Ground Five**

In Ground Five, Petitioner alleges his Fifth and Fourteenth Amendment right to due process was violated when he was denied a state-created right applicable to criminal defendants. Despite Petitioner's reference to alleged due process violations, the Court's review of Petitioner's claim in Ground Five reveals that Petitioner is merely asserting a violation of Arizona state law claiming a violation of state statutory requirements for holding preliminary hearings. (Doc. #1 at 12.) Petitioner bases his claim upon Rule 5.1(a)-(b) of the Arizona Rules of Criminal Procedure. (Doc. #1 at 12.) Ground Five fails to constitute a basis for federal habeas relief.

The Court can grant habeas relief "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). This includes a trial court's evidentiary rulings based upon state law matters unless admission of the evidence was so prejudicial that it offends due process. See id.; Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Additionally, a petitioner cannot "transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996), cert. denied, 522 U.S. 881 (1997); see Engle v. Isaac, 456 U.S. 107, 119-21 (1982) ("While they attempt to cast their first claim in constitutional terms, we believe that this claim does no more than suggest that the instructions at respondents' trials may have violated state law."). Accordingly, the Court will recommend that Petitioner's claim as asserted in Ground Five be denied.

## B. Grounds One through Four and Six – Merits Analysis

Pursuant to the AEDPA[1] , a federal court "shall not" grant habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the state court decision was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and delivering the opinion of the Court as to the AEDPA standard of review).  "When applying these standards, the federal court should review the 'last reasoned decision' by a state court ... ."  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

A state court's decision is "contrary to" clearly established precedent if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 404-05.  "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable."  Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002).

### 1. Ground One

In Ground One, Petitioner alleges that he was denied his Fifth and Fourteenth Amendment rights to due process because the evidence was insufficient to prove guilt beyond a reasonable doubt.  Specifically, Petitioner claims that because the "testimony of [K] [was] the only evidence that any kind of sexual conduct had taken place," there was insufficient evidence support his guilt because her testimony was "objectively unbelievable."

---

[1] Antiterrorism and Effective Death Penalty Act of 1996.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). The relevant United States Supreme Court precedent applicable to claims of insufficient evidence is set forth in Jackson v. Virginia, 443 U.S. 307 (1979): there is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis original). Thus, "the dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318.) A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. See id. at 1275.

When the sufficiency of the evidence is challenged by a state prisoner in federal habeas corpus proceedings, a federal court must review the entire record. See Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), reversed, 483 U.S. 1 (1987); see also Jackson, 443 U.S. at 318 (implying that in federal habeas corpus proceedings, federal courts have a duty to review the underlying facts for an insufficiency of the evidence claim as they do for claims relating to an alleged involuntary confession). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the reviewing court will assign the inference that favors conviction. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury

could reasonably arrive at its verdict." United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)).

Petitioner was convicted and sentenced on one count of sexual conduct with a minor, a class 2 felony[2] and dangerous crime against children, and one count of public sexual indecency to a minor, a class 5 felony.[3] (Doc. #18, Exh. F.)

Initially, Petitioner asserts that there was insufficient evidence of his guilt because the testimony reflecting his sexual conduct with M was "objectively unbelievable" because "the act ... would have taken place under water given [K's] testimony ... that the water level in the tub 'kind of overflowed' when Petitioner got in." (Doc. #1 at 6.) The record, however, refutes Petitioner's claim. At trial, K testified as follows:

Q. Okay. Do you remember what happened in the bathtub?

A. Yeah.

Q. Could you tell me, please?

A. What happened is [Petitioner] got in the bathtub, and me and [M] played together. And we painted on each other.

\*     \*     \*

Q. Do you remember anything about the water in the bathtub?

A. It kind of overflowed.

Q. What do you mean by that? Did it go over the edge of the tub?

A. No.

Q. Okay. When did it overflow?

A. When [Petitioner] got in the tub.

---

[2]  The crime of sexual conduct with a minor required proof that Petitioner: (1) intentionally or knowingly engaged in sexual intercourse or oral sexual contact with another person; and (2) the other person had not reached his/her fifteenth birthday. See A.R.S. § 13-1405 (A).

[3]  The crime of public sexual indecency to a minor required proof that Petitioner: intentionally or knowingly engaged in an act of oral sexual conduct; and engaged in such act with reckless disregard as to whether a person under age 15 was present. See A.R.S. § 13-1403(A)(2).

| | |
|---|---|
| 1 | Q. So it got higher when [Petitioner] got in the tub? |
| 2 | A. Yeah. |
| 3 | Q. Okay. How was it before [Petitioner] got in the tub? How high was it? |
| 4 | A. Kind of low. |
| 5 | Q. Could you see your knees? |
| 6 | A. No. |
| 7 | Q. Could you see your toes? |
| 8 | A. Yeah. |

(Doc. #18, Exh. D at 77-78.) K then went on to testify that she saw Petitioner's "privates" after M pulled up the bottom of Petitioner's shorts and that M "started to suck on [Petitioner's] privates." (Doc. #18, Exh. D at 80-87.) Thus, contrary to Petitioner's claim even though K testified that the water "kind of overflowed" at some point, her testimony does not establish that the event must have taken place underwater, particularly considering her testimony that she "[c]ould see her toes" and that she witnessed M pull up Petitioner's shorts and perform oral sex. It is within the exclusive province of the jury to determine the facts by weighing the evidence presented and the credibility of the witnesses presenting it and to resolve conflicts in testimony. See Jackson, 443 U.S. at 319 ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."); Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009) ("To prevail on an insufficiency of evidence claim, a habeas petitioner must show that 'upon the record evidence adduced at the trial[,] no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'"). Thus, Petitioner's claim that K's testimony was "objectively unbelievable" is meritless.

Equally spurious is Petitioner's claim that there was insufficient evidence supporting his convictions because "[K's testimony was] the only evidence that any kind of sexual conduct had taken place." (Doc. #1 at 6.) The Supreme Court has never held that the uncorroborated testimony of a single witness cannot sufficiently support a criminal

conviction. To the contrary, it is well established that the testimony of a single uncorroborated witness can be sufficient to support a conviction. See Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983); see also United States v. Larios, 640 F.2d 938, 940 (9th Cir. 1981) (holding that "[t]he testimony of one witness" is sufficient to uphold a conviction).

Accordingly, Petitioner has failed to establish that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law. The Court will recommend that Petitioner's claim as asserted in Ground One be denied.

### 2. Ground Two

Petitioner claims in Ground Two that he was denied an impartial jury in violation of his Fifth, Sixth, and Fourteenth Amendment rights.

In Smith v. Phillips, 455 U.S. 209 (1982) the Supreme Court stated:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

455 U.S. at 217; see Greene v. Georgia, 519 U.S. 145, 146, (1996) (per curiam) ("[F]ederal courts must accord a presumption of correctness to state courts' findings of juror bias."). The determination of whether a particular juror was biased so as to deny a defendant a fair trial "is plainly one of historical fact." Patton v. Yount, 467 U.S. 1025, 1036 (1984). And, the state trial judge's findings of impartiality is "presumptively correct under 28 U.S.C. § 2254[(e)(1)]." Phillips, 455 U.S. at 218. Under the AEDPA, a habeas petitioner bears the heavy burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Here, the record supports the trial judge's determination that the challenged jurors could be fair and impartial, and Petitioner fails to rebut that presumption. At the start of *voir dire*, the trial judge instructed the jurors as follows:

The life experiences that help make you how you are today shape you. They shape you. And those life experiences may have left you with some, as they do all of us, with preconceived notions, biases, perhaps some prejudices, based on your life experiences.

Now the fact that you have a preconceived notion or bias or prejudice or some life experience that may have some indirect bearing on the facts of this case does not necessarily preclude you from serving on this jury. What we ask of you as jurors is to recognize your life experiences, the facts of your life for what they are. They relate to your life and they have no application really to the facts in this case. The facts of this case have to be decided based on their own merits and the law that I give you.

The purpose of the questions that I'm going to ask is ... so you can determine in your own mind whether or not you can be a fair and impartial juror in this case.

(Doc. #18, Exh. Q at 23-24.) In response to the trial court's subsequent inquiries, several jurors that were ultimately seated indicated that they had been victims of crime and some indicated that they had previously been victims of molestation. The record reflects that: (1) Juror #1 (panel #4) had a daughter who was 4, had previously volunteered in a rape advocacy program, and had a childhood friend that she later learned had been molested as a child; (2) Jurors #3 (panel #7), #4 (panel #9), #6 (panel #21), and #11 (panel #35) had been molested as children; and (3) Juror #10 (panel #33) had been raped when she was 16. (Doc. #18, Exh. D at 39; Exh. Q at 39-41, 63-65, 70.) After these revelations, each juror indicated that they could put their experiences, emotional responses, and mental images aside, and that they could render a fair and impartial verdict based upon the facts and law of the case. (Doc. #18, Exh. Q at 73-83.) Upon individual questioning, Jurors #4, #10, #11 specifically stated that, despite their experiences, they could listen to the facts and evidence and render a fair and impartial verdict. (Doc. #18, Exh. D at 31-32, 38-40.)

Although Petitioner asserts that "[t]hese jurors are presumed biased as a matter of law because of the negative relationship between their experiences and the nature of the allegations at the issue in trial," (Doc. #3 at 6), it is Petitioner's burden to overcome the presumption of correctness to the court's finding of impartiality. Here, Petitioner has failed to present any persuasive evidence, let alone "clear and convincing evidence" to rebut the presumption of correctness afforded to the state court's determination that a fair and impartial

- 15 -

jury was empaneled.  See United States v. Miguel, 111 F.3d 666, 673 (9th Cir. 1997) (holding that, in a trial for abusive sexual contact, the trial court did not err in failing to excuse jurors for cause based upon statements that they had been the victims of child molestation or that they had relatives that had been victims of child molestation because the juror's indicated that they could render a fair and impartial verdict).  Petitioner's claim is nothing more than unsubstantiated speculation that, despite the jurors' avowals that they could render a fair and impartial verdict, and the state court's finding of the same, he was denied a fair trial.  Such speculation is insufficient to carry Petitioner's burden.

Accordingly, Petitioner has failed to establish that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law.  The Court will recommend that Petitioner's claim as alleged in Ground Two be denied.

### 3.    Ground Three

In Ground Three, Plaintiff alleges that the prosecutor vouched for witnesses and misstated or mischaracterized testimony in violation of Plaintiff's Fifth and Fourteenth Amendment right to due process and a fair trial.

In cases where the state did not deny the defendant the benefit of a specific provision of the Bill of Rights, such as the right to counsel or the defendant's privilege against self-incrimination, the appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power."   Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)); see Phillips, 455 U.S. at 221 ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.").  "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643).  This standard reflects the reality that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Phillips, 455 U.S. at 219.

In determining if a state prisoner's due process rights were violated, the reviewing court "must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly." United States v. Young, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. See Boyde v. California, 494 U.S. 370, 385 (1990); United States v. Robinson, 485 U.S. 25, 33-34 (1988); Williams v. Borg, 139 F.3d 737, 745 (9th Cir. 1998). The Supreme Court has expressly identified defense counsel's conduct as an important consideration in determining the effect of a challenged prosecutorial remark on the fairness of the defendant's trial:

> Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as *Lawn* [*v. United States*, 355 U.S. 339 (1958)] teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940); *Crumpton v. United States*, 138 U.S. 361, 364, 11 S.Ct. 355, 356, 34 L.Ed. 958 (1891). Indeed, most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.
>
> *        *        *
>
> In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

Young, 470 U.S. at 11-13.

Moreover, the Supreme Court has indicated that state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." Donnelly, 416 U.S. at 645; see Slagle v. Bagley, 457 F.3d at 501, 516 (6th Cir. 2006).

The controlling standard for determining whether alleged misconduct constitutes harmless error on habeas review is far more lenient than on direct appeal, as the inquiry is merely "whether the error 'had substantial and injurious effect or influence,'" and whether

- 17 -

1    the error resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

2    (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

3         Petitioner first challenges as improper vouching the following unobjected-to remarks

4    during closing and rebuttal argument regarding K's testimony:

5         Not me, mommy, but [M] sucked on [Petitioner's] wiener. First thing I said
          to you about a week ago. First thing that [K] told Kimberly ... . [K], has
6         [Petitioner] ever touched your privates? No, mommy. ... Not me, but [M]
          sucked on his wiener. What we're about in this trial, ladies and gentleman, is
7         whether you believe [K]. ... [I]n an interview with Detective Minor, once again
          one on one, [K] says to Detective Minor, [M] sucked on [Petitioner's] penis –
8         [Petitioner's] wiener. Three days later, talking to Cherie Leffler, one on one,
          [K] says, [M] sucked on [Petitioner's] wiener. Six months later [K] comes in
9         to court, 14 of you, 5 of us, the court staff, 20 people or more people, what
          happened? [K] said [M] played with his wiener, but he didn't suck on his
10        wiener. That's why you heard from Detective Minor ... [and] Cherie Leffler.
          What inconsistencies were there? Each one of them described from their
11        interview what [K] said to each of them. The size of the penis. How it was
          after [M] played with it. Remember [K] even used a motion. Cherie Leffler
12        described the finger and thumb put together and the motion that [M] did on
          [Petitioner's] penis. What happened then? It stuck straight up. She was
13        scared to come in front of 25, 20 people, and say something that she had only
          told one person individually three different times. And today, ladies and
14        gentleman, I am asking you to believe her from those first three times.

15                                    *       *       *

16        Now Ms. Wakefield when she was talking to you, she wants you to think, I
          guess, that somehow somebody has had some kind of influence on K, to put
17        in [K']s mind these words, this image I guess that's in her mind. ... The
          statement that [K] made to Kim was as spontaneous a statement as we're likely
18        to hear. Because if she was trying to please mom, or if she was trying to say
          what mom wants to hear, she would say, yes, he touched me. I forgot, mom.
19        He touched me. Right? She didn't say that.

20                                    *       *       *

21        Her descriptions, [K]'s descriptions about what happened in the bathtub, the
          masturbatory technique, the length of the penis, were plausible. In fact, they
22        were accurate to what probably happened. There's been no evidence about the
          actual size of [Petitioner's] penis, so we don't know what that size was. But
23        the actions [K] described – she used her hands. ... She was very clear about
          what it was in her head that she saw and what she was able to describe.
24
                                      *       *       *
25
          [Defense counsel during his closing argument] ask[ed] you to think of the fate
26        of [Petitioner]. I ask you, ladies and gentlemen, what about the fate of these
          children? Luckily we caught this. Luckily Aaron [] came back. If her
27        answers were suggested, as [defense counsel] suggests, why were they
          different? Why when I asked her on the stand what happened, did she not say
28        what she had said to interviewers? Because they weren't suggested. That's

                                      - 18 -

the answer. I'm going to answer that rhetorical question. They were not suggested by the interviewers. They were not suggested by her mother. This isn't her story. This is what she saw. This is her observation of what happened to her younger brother. ... And maybe it is very true that we didn't get the whole story of what happened in that bathtub, but we got something that happened with details that she would not otherwise know. ...

(Doc. #18, Exh. S at 22-23, 26, 29-30, 32, 45, 46.)

Contrary to Petitioner's claim, the prosecutor's arguments did not constitute vouching, nor were they improper. Vouching occurs either when the prosecutor places the prestige of the government behind its witness, or when the prosecutor suggests that information not presented to the jury supports the witness's testimony. See United States v. Younger, 398 F.3d 1179, 1190 (9th Cir. 2005) (internal quotation marks omitted); State v. Dumaine, 783 P.2d 1184, 1193 (Ariz. 1989). "The first type of vouching consists of personal assurances of a witness' truthfulness." State v. Dunlap, 930 P.2d 518, 539 (Ariz. Ct. App. 1996). "The second type involves prosecutorial remarks that bolster a witness' credibility by reference to material outside the record." Id. Courts examine the context of challenged prosecutorial remarks to determine whether they constitute impermissible vouching. See State v. Lee, 917 P.2d 692, 697 (Ariz. 1996); State v. Corona, 932 P.2d 1356, 1362 (Ariz. Ct. App. 1997); State v. Hernandez, 823 P.2d 1309, 1316 (Ariz. Ct. App. 1991).

Here, the Court finds that the prosecutor's comments did not fall within the scope of improper vouching. Rather, it is clear that the prosecutor was attempting to respond to Petitioner's proffered defense and argument, which questioned K's credibility and attacked the inconsistency of her statements and testimony, by arguing that her testimony was believable, supported by the evidence, and that the government's case based upon her testimony was the more plausible scenario according to the evidence and testimony presented in the case. See United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993) (holding that the prosecutor must have reasonable latitude in fashioning closing arguments, and can argue reasonable inferences based on the evidence). As such, the prosecutor's comments were not personal assurances of K's truthfulness, nor did they bolster her credibility with reference to material outside the record, and thus, did not constitute vouching.

- 19 -

Petitioner next attacks as a mischaracterization of the evidence that Aaron caught and saw Petitioner getting out of the tub.

At trial, Aaron testified as follows:

A. [I] got home and walked in. I was talking to my brother at the time [on the phone], ... And I walked in and finished talking to him. About 45 seconds later walked towards the bathroom. The door was closed. I opened it up, and that's when I saw [Petitioner] pulling up his pants.

Q. Okay. Which bathroom was it?

A. It was the kids' bathroom.

Q. You said - - describe the door again. You said it was open?

A. I cannot recall if the door was completely latched, but it was closed.

Q. Okay. Can you hear anything going on inside?

A. I heard the kids playing in the bathtub.

\*     \*     \*

Q. Okay. You said that you saw [Petitioner] inside, correct?

A. Correct.

Q. What was he doing?

A. He was standing up against the wall, pulling up his pants.

Q. Was he wearing any other clothing?

A. He had navy blue underwear on. ... Briefs.

Q. Could you tell or not that the clothing was wet?

A. I couldn't tell. I was navy blue. I couldn't tell. I had one glance at it and turned my head away.

\*     \*     \*

Q. How did you react to this?

A. I was in shock. I didn't know what to think at first. My heart stopped and I saw my reflection in the mirror. Then I turned and saw him actually pull them up. Then that's when I turned away and walked out towards the couch in the living room.

\*     \*     \*

Q. Did you notice – what kind of pants was he pulling up?

- 20 -

A. It was denim. I can't recall if they were shorts or pants, but they were denim.

Q. Did you notice them on him once he had pulled them up and put them on?

A. Yes, he put them on.

Q. Did you notice whether or not the denim pants were wet or not?

A. They were dry with patches of wet.

(Doc. #18, Exh. A at 18-22.)

During closing argument, the prosecutor made the following statements:

February 11, 2005, Aaron [] comes home early. He's supposed to go out with the guys that night, have a couple of drinks, have a good time. Stay out till 1:00 or so. Instead he comes home early, 9:00 o'clock. What does he do? He catches [Petitioner] getting out of the tub. Even Ms. Wakefield – we will talk about her in a minute – she said three people with Petitioner in the tub was implausible. But that's what Aaron [] saw. He saw it just two seconds later. His shorts were wet. He's pulling up the pants. And the pants were wet. After they already had been pulled up over the wet shorts. ... Aaron [] did not know what to do. What do you do in a situation like that? You walk home to what should be a houseful of playing children, and they're nowhere to be found until you hear their voices. Oh, they're in the bathroom. You go down that hallway to the door where the bathroom is – on your phone. ... He looks over. ... The door is closed. There are three people in the apartment. They're all in the bathtub, and the door is closed. Why? He doesn't know what to do. He's flabbergasted. ... Absolutely beside himself. Called his brother again. What should I do? What should I do? [Petitioner], unlike any other time in Aaron's [] experience with him, gets out of the tub, puts his clothes on, gathers up the stuff, puts it into his bag, keeps his head down, and walks out the door. Zero conversation. Zero eye contact.

(Doc. #18, Exh. S at 23-25.)

Contrary to Petitioner's claims, the prosecutor's argument neither mischaracterized the evidence, nor did it refer to "largely irrelevant" testimony. (Doc. #3 at 8.) First, the prosecutor's statements were a reasonable statement of the evidence presented at trial. This is particularly so when considering Petitioner's admission to Detective Minor that he had been in the tub with the children on two separate occasions, including the night Aaron came home, and Aaron's testimony that he: (1) discovered Petitioner in the bathroom, with the door closed; (2) witnessed Petitioner in his underwear, pulling his pants up; (3) noted that Petitioner's pants were wet; and (4) was shocked at what he had seen. Thus, the prosecutor's statements were not improper. See Ceja v. Stewart, 97 F.3d 1246, 1253 (9th Cir. 1996)

(holding that "[c]ounsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom"); Bible v. Schriro, 497 F.Supp.2d 991, 1025 n.25 (D. Ariz. 2007) ("Unlike opening statements, during closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."); State v. Dumaine, 783 P.2d 1184, 1193 (Ariz. 1989) (counsel may comment on evidence and argue all reasonable inferences therefrom); State v. Jaramillo, 520 P.2d 1105, 1107 (Ariz. 1974) (recognizing that if a prosecutor's remarks are invited by opposing counsel, the remarks are not grounds for reversal unless they "go beyond a pertinent reply or are necessarily prejudicial").

Equally unavailing is Petitioner's claim that the prosecutor's arguments referred to "largely irrelevant" testimony because Aaron "did not witness any criminal activity, did not speak to the witnesses and testified as to a date on which the witnesses did not allege anything happening and on which no crime was charged." (Doc. #3 at 8.) "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Here, Aaron's testimony that he caught Petitioner in the bathroom with the children, with the door closed, in his wet underwear was clearly relevant as it tended to corroborate both K's testimony that Petitioner had taken baths with the children, and Petitioner's own admission that he had taken baths with the children. As such, the testimony was relevant and the prosecutor's reference to said testimony in his argument was not improper.

Petitioner further claims that the prosecutor mischaracterized the testimony of Kim because he stated that Petitioner "was accepting half the money that the other weekend babysitters would accept." (Doc. #3 at 9.) The record, however, refutes this claim. At trial, Kim testified that when she looked for babysitters, she interviewed four daycare facilities before speaking to Petitioner. (Doc. #18, Exh. A at 58.) She stated that the facilities quoted

her a price of $200.  (Doc. #18, Exh. A at 58.)  Petitioner, however, agreed to provide the
same service for "100, $120."  (Doc. #18, Exh. A at 64.)

During closing argument, the prosecutor stated the following:

Back to February 3rd, the weekend, you recall that Kimberley [] said it was
really the weekend that I was hiring this guy who was accepting half the
amount of money than any other weekend baby-sitter would accept. ... He was
taking advantage of people who cannot otherwise [afford] a baby-sitter. ... He
told them that he liked to help struggling parents, help them out when they
needed help.  He accepted half the pay to get himself alone in a bathtub with
boys, with children.

(Doc. #18, Exh. S at 36-39.)  Contrary to Petitioner's claim, this argument was again a
reasonable inference given Kim's testimony.  See Ceja, 97 F.3d at 1253; Bible, 497
F.Supp.2d at 1025 n.25; Dumaine, 783 P.2d at 1193.

Finally, Petitioner's claims of prosecutorial misconduct fail because any potential
prejudice caused by the prosecutor's closing comments was sufficiently minimized by the
trial court's final jury instructions.  Before closing arguments, the court instructed the jury
that: (1) opening statements by counsel are not evidence; (2) the verdict must be based solely
on the evidence, which the court defined as witness testimony, exhibits, and the parties'
stipulations; and (3) the jury should decide the case without "sympathy or prejudice."  (Doc.
#18, Exh. S at 14-22.)  Overwhelming precedent belies any alleged claim of prejudice
resulting from the prosecutor's allegedly improper comments. See Richardson v. Marsh, 481
U.S. 208, 211, (1987) ("The rule that juries are presumed to follow their instructions is a
pragmatic one, rooted less in the absolute certitude that the presumption is true than in the
belief that it represents a reasonable practical accommodation of the interests of the state and
the defendant in the criminal justice process."); Darden, 477 U.S. at 182 ("The trial court
instructed the jurors several times that their decision was to be made on the basis of the
evidence alone, and that the arguments of counsel were not evidence."); Drayden v. White,
232 F.3d 704, 713 (9th Cir. 2000) ("Additionally, before the lawyers made their closing
arguments, the court instructed the jury that '[s]tatements made by the attorneys during the
trial are not evidence,' and that the jury 'must not be influenced by mere sentiment,
conjecture, sympathy, passion, prejudice, public opinion or public feeling.' We presume that

the jury followed the instructions."); <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir. 1996) (denying habeas relief for allegedly improper prosecutorial remark because "the jury accords less weight to the arguments of counsel than to the court's instructions"); <u>State v. Nordstrom</u>, 25 P.3d 717, 742 (Ariz. 2001); ("Courts do not presume that jurors betray the court's trust and ignore their instructions.").

This is particularly so considering the evidence presented by the State. The State's evidence against Petitioner included testimony reflecting that: (1) Petitioner admitted to taking baths with the children on two separate occasions; (2) when K and M were in the bathtub, K and M were naked and Petitioner wore blue underwear and that M sucked on Petitioner's "wiener"; (3) K stated that "[M] touched Petitioner's winer [sic]," making "a circle with her index finger and her thumb in an up and down motion, ... "[t]hen [M] put his mouth on [Petitioner's] wiener"; (4) the sexual activity happened on two separate occasions; and (5) K described Petitioner's "wiener" being "big, long and stuck straight up." (Doc. #18, Exh. A at 18-22, 30-31, 71, 83, 107-111; Exh. B at 47-48, 54; Exh. C at 12-15; Exh. D at 84.) It is well established that substantial evidence of guilt renders any prosecutorial misconduct non-prejudicial. <u>See</u> <u>Darden</u>, 477 U.S. at 182 ("The weight of the evidence against petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges ... reduced the likelihood that the jury's decision was influenced by argument.") (citation omitted); <u>Cristini v. McKee</u>, 526 F.3d 888, 900 (6th Cir. 2008) ("Nevertheless, some of the prosecutor's opening and closing argument went beyond the bounds of the ruling that permitted other acts evidence to establish Defendant's identity. We find, however, that the Michigan Court of Appeals reasonably found that this character argument was harmless in view of the admissible evidence that established the Defendant's guilt."); <u>United States v. Green</u>, 435 F.3d 1265, 1269 (10th Cir. 2006) ("The amount of evidence presented against Defendant satisfies us the alleged misconduct had a minuscule effect, if any, on the jury's verdict."); <u>United States v. Washington</u>, 417 F.3d 780, 787 (7th Cir. 2005) ("Finally, like most prosecutorial misconduct claims, Washington's claim founders in the face of the strong evidence of his guilt."); <u>Cotton v. Cockrell</u>, 343 F.3d 746,

752 (5th Cir. 2003) ("Given the overwhelming evidence of guilt and the court's cautionary instruction to the jury, we conclude that the prosecution's statement had no substantial and injurious effect or influence in the determination of Cotton's guilt."); Drayden, 232 F.3d at 712 (citing Darden to support holding that misconduct was non-prejudicial because "the evidence of Petitioner's guilt of first-degree murder was very strong").

Accordingly, the state court's rejection of Petitioner's claim was neither contrary to, nor did it involve an unreasonable application of, clearly established Federal law. The Court will recommend that Petitioner claim as set forth in Ground Three be denied.

### 4.    Ground Four

In Ground Four, Petitioner alleges that prospective jurors were impermissibly stricken by the prosecutor based on gender in violation of equal protection under the Fourteenth Amendment. Specifically, Petitioner claims that the State violated his right to equal protection as set forth by Batson v. Kentucky, 476 U.S. 79 (1984) when it utilized 5 of its 6 peremptory challenges against male prospective jurors. Petitioner's failure to file a contemporaneous objection at trial, however, bars any consideration of this claim on habeas review. Assuming, however, that Petitioner's failure to object is not fatal to his claim, Petitioner cannot make even a *prima facie* showing of purposeful discrimination sufficient to establish a Batson violation.

The United States Supreme Court set forth the clearly established federal law governing this claim in Batson. There, the Court held that the Fourteenth Amendment's Equal Protection clause limits the state's ability to use its peremptory challenges to exclude potential jurors solely because of their race. See id. at 86. The Supreme Court set forth a three-step process for reviewing claims that the state's use of a peremptory challenge violated equal protection:

> First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

- 25 -

Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (citations omitted).

During *voir dire*, Petitioner's jury panel included 32 female and 18 male prospective jurors. (Doc. #18, Exh. T.) The trial court excused 15 prospective jurors for cause – 8 female and 7 male. (Doc. #18, Exh. T.) The State used its peremptory strikes to remove one female and five male jurors. Petitioner did not object. (Doc. #18, Exh. T; Exh. D at 40-42.) Petitioner subsequently used his peremptory strikes to remove four female and two male jurors from the panel. (Doc. #18, Exh. T; Exh. D at 40-42.)

Initially, the Court notes that Petitioner has forfeited his Batson claim by failing to raise a contemporaneous objection alleging an equal protection violation or otherwise object to the gender composition of the jury at trial. See United States v. Contreras-Contreras, 83 F.3d 1103, 1104-05 (9th Cir. 1996) (holding that a defendant forfeits a Batson claim if the defendant fails to make a timely objection to the prosecution's assertedly discriminatory use of peremptory challenges); see also Allen v. Lee, 366 F.3d 319, 327-28 (4th Cir. 2004) (en banc) (concluding the defendant "did not adequately preserve his *Batson* objection ... [by remaining silent] after the trial judge's repeated calls for objections after the actual jury selection" and emphasizing the defendant's claim had not been procedurally defaulted); McCrory v. Henderson, 82 F.3d 1243 1249 (2nd Cir. 1996) ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); Sledd v. McKune, 71 F.3d 797, 799 (10th Cir. 1995) (concluding there was no basis to review a peremptory challenge when an objection had not been made in the state trial court).

Petitioner's failure to raise the Batson issue during trial resulted in a trial record that is not sufficiently developed to support an evaluation of the jury selection practice under Batson. See Sledd, 71 F.3d at 799 (where no Batson objection was made at trial, "there is no basis for us to review the peremptory challenge"); Thomas v. Moore, 866 F.2d 803, 805 (5th Cir. 1989) ("A timely [Batson] objection and the corresponding opportunity to evaluate the circumstances of the jury selection process are essential to a trial court's reasoned application of the limitations placed on peremptory challenges by the Batson holding.").

Here, because Petitioner did not object, no analysis of the prosecutor's reasons for the strikes is possible, for the prosecutor had no reason to believe any such explanations were necessary, and so never provided any. Accordingly, because Petitioner failed to make a timely objection, he has forfeited his Batson claim.

Assuming Petitioner's failure to object is not fatal to his claim, he has failed to meet his burden in establishing a *prima facie* case of purposeful discrimination. To successfully challenge a peremptory strike, a party must set forth a "*prima facie* case of purposeful discrimination by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. Petitioner has failed to establish that the totality of the relevant facts gave rise to an inference of gender-based discrimination. The State did not employ all of its peremptory strikes to remove males from the jury panel; a female prospective juror was also excluded. Moreover, three males remained and Petitioner used his peremptory strikes to remove two of the remaining male prospective jurors. (Doc. #18, Exh. T.) A *prima facie* case generally cannot be established where only some, but not all, members of a cognizable group are struck. See United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994) ("Using peremptory challenges to strike Blacks does not end the inquiry; it is not per se unconstitutional, without more, to strike one or more Blacks from the jury"); State v. Eagle, 992 P.2d 1122 (Ariz. Ct. App. 1998) (holding that a *prima facie* case generally cannot be established where only some, but not all, members of a cognizable group are struck); State v. Thompson, 950 P.2d 1176, 1178 (Ariz. Ct. App. 1997) (holding that where the defendant failed to offer a single reason, other than the strike of a minority juror, to support his Batson claim, and another minority juror went unchallenged and served on the jury, the trial court did not abuse its discretion in finding that the defendant failed to make a *prima facie* showing of purposeful discrimination).

Here, Petitioner has failed to offer a single other reason, statistical or otherwise, to justify his claim of discriminatory strikes other than the fact that the State used a majority of its strikes to exclude male jurors. Thus, because there is a complete absence of support for Petitioner's Batson claim, male jurors remained on the panel, and because Petitioner himself

struck several male jurors, Petitioner has failed to establish a *prima facie* showing of purposeful discrimination.

As such, Petitioner has neither established that the state court's rejection of Petitioner's claim was contrary to, nor involved an unreasonable application of, clearly established Federal law. The Court will recommend that Petitioner's claim as asserted in Ground Four be denied.

### 5. Ground Six

Petitioner contends in Ground Six that he received ineffective assistance of counsel at trial in violation of his Sixth Amendment rights based on the failure to make appropriate motions and objections and to preserve constitutional issues. Specifically, Petitioner claims that he received ineffective assistance because his trial counsel: (a) failed to move for directed verdict based upon K's alleged lack of credibility; (b) did not file a motion for a new trial on the ground that the verdict was contrary to the weight of the evidence based upon K's alleged "improbable testimony" and that "the prosecutor's arguments and statements denied Petitioner a fair trial"; (c) did not object to the prosecutor's closing argument; (d) failed to challenge juror numbers 1, 3, 4, 6, 10, and 11 for cause; (e) did not object to the prosecutor's use of peremptory challenges; (f) did not object when the trial court vacated his preliminary hearing.

The two-prong test for establishing ineffective assistance of counsel was established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on an ineffective assistance claim, a convicted defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 687-88.

Regarding the performance prong, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. See id. at 690. "[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bonin v. Calderon, 59 F.3d 815, 833 (9th Cir. 1995) (quoting Strickland, 466 U.S. at 689). Moreover, review of counsel's performance under Strickland is "extremely limited": "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir.), judgment rev'd on other grounds, 525 U.S. 141 (1998). Thus, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690.

If the prisoner is able to satisfy the performance prong, he must also establish prejudice. See id. at 691-92; see also Smith v. Robbins, 528 U.S. 259, 285 (2000) (burden is on defendant to show prejudice). To establish prejudice, a prisoner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. See Robbins, 528 U.S. at 286 n.14. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. (quoting Strickland, 466 U.S. at 697).

In reviewing a state court's resolution of an ineffective assistance of counsel claim, the Court considers whether the state court applied Strickland unreasonably:

> For [a petitioner] to succeed [on an ineffective assistance of counsel claim], ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [state court] applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002) (citations omitted); see also Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied Strickland incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner.") (citations omitted).

Having reviewed the record, the Court finds that the state court did not unreasonably apply Strickland. The Court will recommend that Petitioner's claim as asserted in Ground Six be denied.

**a. Failing to move for a directed verdict based upon K's alleged lack of credibility.**

Petitioner asserts that his trial counsel rendered ineffective assistance by failing to renew a motion for a directed verdict based upon K's alleged lack of credibility and conflicts within the evidence.

The record reflects that at the close of the State's evidence, defense counsel moved for a directed verdict on all counts pursuant to Rule 20 of the Arizona Rules of Criminal Procedure, and succeeded in garnering the dismissal of Counts 1 and 2 of the indictment. (Doc. #18, Exh. C at 16-27.) Petitioner, however, contends that his counsel was ineffective because he failed to renew the motion based upon alleged conflicts with K's testimony. As the Court has indicated, while K's testimony was arguably inconsistent, it is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the reviewing court will assign the inference that favors conviction. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). Thus, defense counsel's choice not to renew the motion for directed verdict was a reasonable tactical choice that is insufficient to constitute ineffective assistance. See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (tactical decision by counsel with which a defendant disagrees cannot form a basis for an ineffective assistance claim); Gerlaugh v.

Stewart, 129 F.3d 1027, 1033 (9th Cir. 1997) (a reasonable tactical choice based on an adequate inquiry is immune from attack under Strickland); see also United States v. Mejia-Mesa, 153 F.3d 925, 931 (9th Cir. 1998) (failure to make certain objections as a matter of overall litigation strategy does not constitute ineffective assistance).

Moreover, Petitioner has failed to establish prejudice. The record reflects that defense counsel moved for a directed verdict on all four counts and was successful in getting Counts 1 and 2 dismissed. Petitioner has failed to carry his burden of establishing that, had defense counsel argued that K's testimony was inconsistent and incredible, it would have persuaded the court to dismiss the remaining two counts. This is particularly so, when considering that it is within the exclusive province of the jury to determine the facts by weighing the evidence presented and the credibility of the witnesses presenting it. See Jackson, 443 U.S. at 319 ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

Thus, Petitioner has not shown deficient performance or prejudice.

**b.     Failing to file a motion for new trial on the ground that the verdict was contrary to the weight of the evidence.**

Petitioner alleges that defense counsel rendered ineffective assistance when he failed to file a motion for new trial based upon "[K]'s improbable testimony, the victim's denial of the charged conduct, [and] the witness's inconsistent court testimony ... ."

To set aside a jury verdict for insufficient evidence, it must clearly appear that upon no hypothesis whatsoever is there sufficient evidence to support the conclusion reached by the jury. See State v. Arredondo, 746 P.2d 484, 486 (Ariz. 1987). Petitioner's mere allegation that there was conflicting evidence and inconsistent testimony is insufficient to constitute a verdict which goes against the weight of the evidence presented here. Thus, because the offense was clearly proven by the evidence presented, counsel could not have been ineffective by failing to file a motion for a new trial based upon insufficient evidence.

Moreover, Petitioner's claim must be rejected because he has failed to make any showing that, had such a motion been filed, there is a reasonable likelihood that the motion would have succeeded. This is particularly so, where trial counsel moved for a directed verdict on all counts and was successful in garnering a dismissal of Counts 1 and 2. Petitioner has presented no evidence that supports a finding that, had the motion been filed, the trial court would have reconsidered its previous ruling denying the motion for directed verdict as to counts 3 and 4. Thus, Petitioner has failed to establish that, had a motion for new trial been filed, the trial court would have reconsidered and overturned its previous ruling denying a directed verdict as to Counts 3 and 4. Accordingly, no prejudice has been shown.

**c.      Failing to object to alleged prosecutorial misconduct during closing argument and failing to move for a new trial on the same grounds.**

Petitioner argues that trial defense counsel rendered ineffective assistance when he failed to object to the prosecutor's closing argument which Petitioner claims included vouching and mischaracterization of the evidence and failed to move for a new trial on the same grounds. Specifically, Petitioner claims that, had the objection been made, "the judge probably would have sustained the objections or granted a new trial had defense counsel raised the issue."

As the Court discussed previously, the prosecutor's closing remarks did not constitute vouching, nor did he mischaracterize the evidence presented at trial. Thus, because these statements were not improper, any objection or request for a new trial would have been denied, and therefore, Petitioner has failed to overcome the presumption that, under the circumstances, defense counsel's actions constituted sound trial strategy, let alone establish that, even had defense counsel objected, there is a "a reasonable probability that absent the errors the fact finder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 687-94 (citations omitted); see United States v. Molina, 934 F.2d 1440, 1448 (9th Cir. 1991) (recognizing that counsel's failure to object may be reasonable because of fear that jury might construe objections as "a sign of desperation and hyper-technicality").

1    Petitioner has failed to establish deficient performance or prejudice.

2         **d.    Failing to challenge for cause Jurors #1, #3, #4, #6, #10, and #11.**

3         Petitioner asserts that his trial counsel rendered ineffective assistance by failing to

4    challenge several jurors for cause because:  (1) Juror #1 (panel #4) had a daughter who was

5    4, had previously volunteered in a rape advocacy program, and had a childhood friend that

6    she later found out had been molested as a child; (2) Jurors #3 (panel #7), #4 (panel #9), #6

7    (panel #21), and #11 (panel #35) had been molested as children; and (3) Juror #10 (panel

8    #33) had been raped when she was 16.

9         At trial, Jurors #1, #3, #4, #6, #10, and #11 all indicated that, despite their past

10   experiences, they would be able to render a fair and impartial verdict and decide Petitioner's

11   guilt based upon the facts and law of the case.  (Doc. #18, Exh. Q at 73-83.)  Upon individual

12   questioning by defense counsel, Jurors #4 and #11, indicated that they could listen to the

13   evidence and render an impartial verdict.  (Doc. #18, Exh. Q at 73-83; Exh. D at 38-40.)

14   Similarly, Juror #10, specifically stated that, despite her past experiences, she could be "fair,

15   logical, and objective" and would be able to render an impartial verdict.  (Doc. #18, Exh. D

16   at 31-33.)

17        Based upon this record, Petitioner has failed to overcome the presumption that defense

18   counsel's decision to not challenge these jurors for cause constituted a reasonable

19   professional judgment.  The standard for qualification as a juror is fairness and impartiality:

20   whether the person could set aside any personal feelings that they might harbor, keep an open

21   mind throughout the presentation of the evidence, and base their verdict solely on the

22   evidence that has been presented at trial.  See Bible, 858 P.2d at 1176.  In this respect, even

23   a preconceived notion of guilt is not sufficient to justify a strike for cause, so long as the

24   juror indicates that he can set aside that opinion and render a verdict on the facts.  See State

25   v. Atwood, 832 P.2d 593, 647-48 (Ariz. 1992), cert. denied, 506 U.S. 1084 (1993), overruled

26   on other grounds by State v. Nordstrom, 25 P.3d 171 (2001).  The juror's promise to "try"

27   to set aside the preconception is sufficient to overcome a motion to strike, see State v. Oliver,

28   821 P.2d 250, 253 (Ariz. Ct. App. 1991), as is the juror's promise to "try" and follow the trial

court's instructions. See State v. Comer, 799 P.2d 333, 346 (Ariz. 1990). A juror's "strong feelings" is not sufficient cause to strike a juror, see State v. Cocio, 709 P.2d 1336, 1339 (Ariz. 1985), nor is a juror's serious misgiving about his ability to be fair if that potential juror ultimately assures the judge that she can be fair. See State v. Sexton, 787 P.2d 1097, 1098-99 (Ariz. Ct. App. 1989). In the instant case, because the juror's indicated that they would be able to set aside personal feelings and experiences and decide this case on the facts presented in the court room, any challenge for cause would have been futile.

Moreover, Petitioner's reliance upon United States v. Gonzalez, 214 F.3d 1109 (9th Cir. 2000), for the proposition that there was imputed bias is misplaced. In Gonzalez, a juror indicated that he had personal experiences similar to the fact pattern at issue at the trial and never indicated that she would be able to serve impartially and fairly. See id. at 1113-1114. Here, in contrast, Jurors #1, #3, and #6 indicated that their personal experiences would not prevent them from rendering an impartial verdict, and Jurors #4, #10, and #11, upon individual questioning, affirmatively stated that they could be fair and impartial despite their personal history and would not be adversely affected by their past experiences. As such, there was no actual or imputed bias. Thus, there was no basis for counsel to challenge these jurors for cause, and thus, counsel could not have been ineffective for failing to do so. See United States v. Quintero-Barraza, 78 F.3d 1344, 1349-50 (9th Cir. 1996); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (holding that counsel is not required to argue frivolous or groundless matters).

Finally, Petitioner cannot establish the prejudice. Petitioner has failed to support his claim with any evidence of actual or implied juror bias. An ineffective assistance of counsel claim based on counsel's failure to strike an allegedly biased juror requires a petitioner show a juror's actual bias. See Miller v. Francis, 269 F.3d 609, 616 (6th Cir. 2001) (holding that when a defendant claims that counsel was ineffective for failing to strike a juror, it is the defendant's burden to establish that the juror was biased). Petitioner's claim that the jurors must have been biased because of their past experiences is pure speculation, particularly

when considering that each of the jurors indicated that, despite their personal experiences, they could render a fair and impartial verdict.

Accordingly, Petitioner has shown neither deficient performance nor prejudice.

**e.     Failing to object to the prosecutor's peremptory strikes.**

Petitioner contends that his trial counsel was ineffective for failing to object to and argue that the prosecutor violated Batson by using peremptory strikes to remove male prospective jurors. Petitioner's claim, however, fails because, as has been discussed he failed to make a *prima facie* showing that the prosecutor's peremptory strikes raised an inference of gender discrimination. Thus, the burden never shifted to the State to give reasons for its strikes, and the trial court did not err by not requiring the State to explain the reasons for the strikes. As a result, he cannot establish that defense counsel acted incompetently. See Batson, 476 U.S. at 96 (defendant has burden of establishing *prima facie* case of discrimination by showing that the prosecutor excluded from venire members of defendant's race, under circumstances raising an inference of racial discrimination).

Assuming, however, that defense counsel somehow erred, Petitioner is not entitled to relief because he has not established prejudice. He has failed to demonstrate that counsel's decision not to pursue the claim resulted in an unfair trial or that the jury that heard his case was not fair and impartial.

Thus, Petitioner has not established that counsel acted incompetently or that prejudice resulted from counsel's actions.

**f.     Failing to object when the trial court vacated his preliminary hearing.**

Petitioner asserts that his counsel rendered ineffective assistance in failing to object when the trial court vacated his preliminary hearing.

The record reflects that Petitioner was initially charged by way of direct complaint, but the State subsequently filed a supervening indictment. Accordingly, Petitioner was not entitled to a preliminary hearing. See Ariz.R.Crim.P. 5.1 cmt. ("Rule 5 implements Ariz. Const. Art. 2, § 30 which guarantees a preliminary hearing to persons accused of a felony *by means other than a grand jury indictment*.) (emphasis added.) Thus, because Petitioner was

- 35 -

not unfairly denied a preliminary hearing, Petitioner has established neither that his counsel was ineffective by failing to object when the trial court vacated the hearing, nor resulting prejudice.

**CONCLUSION**

Having determined that Ground Five fails to state a basis for federal habeas relief, and Grounds One through Four and Six fail on the merits, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. #1) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. See Rule 72, Federal Rules of Civil Procedure.

**DATED** this 30th day of April, 2010.



Michelle H. Burns
United States Magistrate Judge